We'll take the cases in the order in which they appear on the calendar. Thank you, Your Honor. May it please the Court, my name is Sandy Svetkov, the Milberg West firm in San Francisco. I represent the plaintiff union pension funds who appeal the district court's dismissal of their securities fraud complaint against Oracle Corporation and its principal executives. I'd like to reserve five minutes of my time for rebuttal. I'll try to keep track of it. I've got the watch and clock. Good. Thank you. We're off to a good start. I came to Milberg shortly after the Silicon Graphics decision and thereafter watched as this court decided about 20 straight cases adverse to the plaintiffs in these securities cases. And we at the firm took heed to that trend and developed a new, more focused investigational approach and pleading approach to these cases. And this case is the first of those new cases to come before this court. If you recall in Silicon Graphics, we had what the court described as a boilerplate complaint, saying that the counsel did a lot of investigation, talked to a lot of witnesses, and reviewed a lot of documents, and here's what we found. We were criticized for not pleading witness sources. We were criticized for not pleading the defendant's statements carefully enough. We were criticized for not pleading the contents of documents. We have all of those things in this case. But before I get to that, let me quickly set the table and outline what the false statements are in this case. And I know you're familiar with it, but I think it's worth repeating, because the factual basis for why they are false are the crux of this case. Defendants Ellison, Henley, and Sanderson at various times said the declining economy was not hurting Oracle. They said that there was no weakness in their application sales in Europe, Asia, or the United States, and that the pipelines for the quarter looked astounding. They said that their application suite 11i was preintegrated. You could literally plug and play them like Legos, the games my kids used to play. Now they're too grown to do that. They said as a result of all of this, they would enjoy 75 percent growth in application sales and that they would earn 12 cents in the quarter. We pled 49 witness sources, including three former vice presidents, five customers, 12 directors all over the United States, managers all over the United States, consultants all over the United States, financial analysts, who said that in the middle of 2000, on the eve of the third quarter, during the second quarter, the economy was affecting Oracle. Sales were going down. Secondly, they said that the product that they were touting that had come on the market in mid-2000, the 11i suite of applications, was not integrated. It did not communicate well. It did not have the interface capability. And they've said further that this resulted in revenue losses, specific lost sales. The witnesses identified 20 sales that were lost, some of them in dollar amounts, four sales in dollar amounts ranging between $130 million and $186 million. I think the district court's answer to that argument is that customarily they lose a certain percentage, two-thirds, I think, of the anticipated sales, or the sales that are potential sales, and that these were just the normal losses that always occur. What's the response to that? This is a 12b-6 motion. We're not at summary judgment or trial. How did that assertion become a part of the 12b-6 allegation mix? How did it become part of the 12b-6 allegation mix? How did the district court get to consider what they assert is normal? That's not in the complaint. That's not in the -- where did that come from? Well, there is a problem, I agree with you, about our law in 12b-6 cases. Nevertheless, we are stuck with this odd problem of trying to do what you say. Somebody comes in and says, well, they only sold 20 widgets instead of 25. Well, how do we know whether that's good or bad when you come in and tell us they only sold 20 out of 25? How is the court supposed to know whether that's a good thing or a bad thing? Maybe losing a third of them shows it was a remarkably good year. Well, it may. It may. But they are saying at the beginning of this quarter that sales look astounding and they're going to have 75 percent growth in sales of these products. And less than three months later, they step up to the plate and say, oops, the economy did hurt us. Oops, we didn't sell 75 percent growth. We sold 25 percent. That's a 67 percent miss. Oops, we didn't make 12 percent earnings, only 10 percent. They missed by 17 percent their earnings prediction. That means they made $112 million less than they forecast. They expected about 580. That's almost a 20 percent drop in growth. Now, growth is important. You say, well, they still grew. Of course they still grew. They're a big company. Big companies are not immune from engaging in improper activities. Enron, WorldCom, we know the unfortunate history of corporate irresponsibility in the last few years. But those are significant misses. That is to say what happened is the witnesses' front sight, what they said and what they saw, was what happened. And how could the defendants say they didn't see what the witnesses saw? They agreed that they looked at the same database and monitored it, and it was up to the minute about what sales were against forecasts. And if they lost $233 million or they missed their predictions by $233 million and they suffered 180 of that in the first month of the quarter, doesn't that tell them that maybe they should be a little more cautious about continuing to predict 75 percent growth in January and February? It may be that this was the case. What should they have said? Pardon? What should they have said? Well, tell me exactly. Either they should have acknowledged that the economy was having an impact, or they should Nobody knows that. They said the very opposite, Judge Ferguson. They said not only was the economy not hurting Oracle, they said it was affording Oracle new opportunities because they had developed this new product which they could sell to their customers because it would enable them to do their job more cheaply. See, it seems to me that it's almost like two parents. One parent says, my children are better looking than yours. That's what the officers of Oracle were saying, weren't they? Well... We're better than the economy. Yes, they were saying that, but it wasn't true. It wasn't true, Judge Ferguson. I mean, tell the truth. That's what should have happened. The economy was hurting. Their product was suffering defects, and it was affecting their sales. Before you go on any further, just talk about the debit credit. Yes. In our last complaint, we were able, during the process... The recognition of revenue. Right. In the second quarter, the company predicted 10-cent earnings. They recorded 11-cent earnings. They did that by taking revenue... The best evidence are Oracle's own documents. The debit memos that say credit revenue, they say it. Our witnesses, one of whom worked in the finance department, witness number 49, said he worked for the vice president of revenue recognition. He said he saw it happen. He said he went to the vice president of revenue recognition and said, this is improper, you're taking customer overpayments and recording it as revenue. He was told to mind his own business. But it was his business. Anything that's improper ought to be called to the attention of management, and management ought to do something about it. Now, I appreciate that our opponents will say that never happened. It was an internal accounting adjustment. That's not a defense at a 12B6 motion. That's a defense at trial. That's a defense at trial. Even Judge Jenkins recognized that. But what he said was CW49 was not in a position to know. He cannot disbelieve CW49. CW49 said he saw it. He identified the people who were involved. He said the vice president, Minton, who signed a 10Q and is the controller of the company, told Vice President Quinn to convert that customer overpayment account to revenue, to clean it up. CW46, who represented customers outside the company, did an amazing investigation. He or she got 760 internal Oracle documents, compared that to what our customers had paid, found that the exact same amounts of money were being credited as revenue on these debit memos that had been paid earlier. That was an amazing investigation. And so when you dovetail CW46 and CW49, and then there was another witness, CW48, who worked as an analyst in the department, also said that the customer overpayments were never refunded. And when the company gives us documents in response to our motion to dismiss that say credit revenue and say that we were, we understated the amount. It wasn't $228 million. They now say it was $692 million. And although it's not pled in the complaint, after the motions to dismiss hearings, there was a battle over preserving evidence. And we got this e-mail from Vice President Quinn. And what it does is it shows that what the witnesses say and what the debit memos say are not made up. Vice President Quinn, in 2002, telling his people, we need to provide what impact this process has had on revenue in each of the last eight quarters. Well, if they're talking about maybe this had revenue impact in the last eight quarters, what are we supposed to think? And we have to put them back in the proper buckets. Customer overpayments, it's right here on ER86. Take a look at it in the record. So they say customer overpayments were involved. We need to establish new policies and procedures. The district court judge, in his opinion, talking about one of these overpayment accounts, said that that account was 10 years old. You remember him saying that? Yes. You remember him saying that? Now, had the statute of limitations run on that account? And if it had run, would that make a difference? No. And it hadn't run. And I'm not sure it would make a difference because the improper conduct, the improper conduct was in several parts. First, the customer overpaid in 1990. Okay? So Oracle had the money on account.  And they didn't refund it. What if the statute of limitations had run? Whose money is that? It's the customer's money. That's the point, isn't it, Judge Ferguson? But the customer can't get it because the statute of limitations has run. Well, why? Why? Why? It's not Oracle's money. Whose money is it? It's the customer's money. It's an overpayment that Oracle should have refunded. It isn't his money because he can't get it. He has now hired people to retrieve it. Remember, these overpayments were accumulating from 1990 to 1997 and 1999. When did the customers learn that they might be entitled to an overpayment, or did they ever learn? Or do some even know that they might be entitled to an overpayment? I suspect that they hired CW46 to find that out. CW46 was hired by Eli Lilly, by General Electric, General Motors, by major companies because there was some suspicion that maybe they had overpaid. And the CW46 did this investigation that, in fact, concluded there were overpayments that had not been refunded. And the witnesses confirmed that the refunds hadn't been refunded. CW48 said that. CW49 said that. The six named analysts inside Oracle told CW46 that this was the case. There's a fax from Mr. Campos that's attached to the complaint as Exhibit 42 that talks about a series of these debit memos being converted. And the debit memos say credit revenue. And they can say, until the cows come home, that credit revenue doesn't mean that they recognize the revenue. But if you look at the dictionary of accounting terms, and credit revenue is defined as increased revenue. Let me just change the subject for just one moment. What does the alleged insider trading, the total of about $925 million in sales by Henley and Ellison. Mostly by Ellison. What does that really add to the strong inference of reckless. The timing is important. The judge thought that the insider trading was two months before the revelation of the truth and the bad news. It was four weeks. Ellison traded between January 22nd and January 31st. Shortly after, the false statements pumped the stock up to its highest level at $30 and $32. He sold at $30 and $32, stock that he acquired for 23 cents a share. And then four weeks later, the stock craters to 16. And we have this amazing statement from counsel saying, well, that was only 2% of his stock that he sold. He kept 98% of his shares. You know, the judge found he suffered the same large losses as the plaintiffs. No way. No way. If David Letterman was counting that on the ten most incorrect statements by a federal judge, that would be number one. No way that Ellison lost a penny. His stock was at 23 cents. He had maybe on paper something, but he didn't lose a penny. The plaintiffs who bought at 30 and now are at 16 lost the difference between that. Ellison sold at the high point and hadn't sold for five years. The timing of his false statements, the pump up of the stock, the crash. On his prior sale, how much stock had he sold at that point? In five years? The earlier sale, five years prior to. I have no ‑‑ we have no idea. All we know is he hadn't sold in five years. Mr. Svetkoff, we have carried you below your five minutes. If you'll stop now, we'll give you five minutes. Thank you. It's a deal. Counsel? Thank you, Your Honor. Donald Faulk for the defendants. Mr. Svetkoff claims that this is a new form of pleading, and it may be new in form. But once again, the critical facts, the ones that you need to plead in order to get over the line to demonstrate knowing falsity or other form of conscious misconduct aren't there. Before I dive in, I want to just answer one question the Court raised about where, wherever did the district court get the idea that there was a conversion‑rated issue here, that there was some difference between the number of deals contemplated and the number closed. And the place he got that idea was Plano's first complaint, which is in the supplemental excerpts of record in page 33, paragraph 32, where they plead exactly that, that one in three, about one in three deals closed. It's common sense, but it's also something that's in the record. Now, again, the problem with this complaint is not that there are no details, that there's no background. There's lots of background. There's lots and lots of background. The problem is that when you get up to the point that plaintiffs try to plead something that might indicate that something was wrong, that's when either the details disappear altogether or conclusions are pleaded through people without any pleaded basis to know what they're talking about. Start with the debit memos. The documents that they provide talk about data cleanup. They have offsetting entries to one account. Yes, there's a credit revenue line there, but what does that mean? They have someone with no knowledge of Oracle's accounting practices reading a software user manual and saying, oh, it says for debit memos it generates a line that says credit revenue. Well, what does that mean? Does that mean that revenue is credited? Well, they don't tell us how it was credited. Was it credited just in some big pile somewhere? No, it had to have been reported. It was reported as earnings in some form. They don't say how. There's no connection to any kind of transaction. Is it applications? Is it licensing of some other kind? Is it consulting? The document speaks for itself. And the document speaking for itself says we took $30,000 that we owed, and by changing a name, we created revenue. Well, Your Honor, I didn't. Doesn't it say that on its face? No, it has a description on its face of revenue, but in the context of the totality of this complaint. Well, what does it mean? Well, what does it mean? Where are the plaintiffs? The plaintiffs have these documents, and they're trying to stitch this. It tells us that revenue is money. Isn't it money? Revenue, when it's actual. You have to have 10 people come in the court and say revenue is money? Everybody knows revenue is money. What plaintiffs fail to do, they submit these documents, and then they don't have they talk to the people who could explain this. They let the court try to piece this together, to piece this confusion together. They talk to someone they claim is a manager of revenue accounting, doesn't say a word about how debit memos work, doesn't say a word about any kind of accounting fraud or any kind of thing. They speak to the vice president of finance, one of their first witnesses. The point is, do they have to? Yes. Doesn't the document speak for itself sometimes? Sometimes the document may speak for itself. Revenue in anybody's language? In the totality of the pleading here, it does not. They speak to a vice president of finance who you would think, they claim that everybody in the finance department has complete insight into everything. You would think that this witness might have had something to say about revenue in the second quarter of fiscal 2001, and he does. He does have something to say about revenue. He says Oracle made their numbers in 2001. He doesn't say because of some accounting slight of hand two weeks before. When you look at the totality of the pleading again, it doesn't add up enough to create, raise a strong inference of conscious wrongdoing. Why? Well, let's see what they're pleading here. Their theory is that these customer overpayments, they need to find some real money somewhere, so they have the customer overpayments, which they plead were amounted to about $130 million, resulted in $230 million of revenue based on $690 million of identical debit memos. Where do they explain how this lines up? They don't. On the face of it, the pleading is self-contradictory. They had access to people who might have been able to sort it out. Do they sort it out? No. They just have someone from outside the company saying all this somehow resulted in the recognition of revenue. They leave the court to guess. That is not enough. It's not only that it says it's revenue. In addition, you're supposed to draw the inferences in favor of the plaintiff. And what inference would you draw? I mean, why, as Judge Ferguson said, why do they have to do anything other than come in, produce a document which says revenue, and have us either read it and say, yes, it says revenue, or infer that it went into revenue? Well, in the totality of the pleading here, in their full theory, it doesn't add up. If all they had was this document and they were trying to get all the way home on that, I think it would be too sketchy. 43,000 documents, not just one. They have 46,000. There was a debit memo run. We're very clear about that. We submitted the records of the whole thing because we have nothing to hide about the debit memo run. But it's not you don't have to take our word for it because their theory doesn't add up. How do you get – their theory is that $130 million of cash became $230 million of revenue through $690 million of debit memos. Now, how does that ever – how can that possibly be reconciled? They don't even try. That's not enough to support an inference that this was actually recognized as revenue anywhere on Oracle's books. Well, isn't there also – there was also evidence that the – there was a $200 million shift from the – to revenue from – I don't remember what it was from. It was $2 billion something and then it went down by $200 million? I think Your Honor is referring to the cyclical variation in the balance in the customer – I believe it's called the customer advances and overpayments account in the 10 Qs. Is that what you're thinking of? Probably, yes. Is that what – Yes. Well, again, what inference can you draw from those – that public document? Well, if you're going to start looking at inferences from patterns in the reported public documents, we submitted all the other relevant within a four- or five-year period, and every year there's a similar drop from one quarter to the next. And there's an explanation for it, which is that the last quarter, the fourth quarter, is when Oracle does a disproportionate amount of its business. Consulting deals are paid, prepaid, but they're not earned. So it's advances. Once the consulting is performed, then it is earned. The revenue is recognized. It's no longer an advance. It's applied against an invoice. You've got this pattern going year after year after year, yet their theory is for this year only, for this year only you're supposed to draw an inference that revenue was recognized based on the application of customer overpayments dating back 10 years. That doesn't add up, Your Honor. It just doesn't add up. It's not enough to draw an inference of fraud. Whatever it might be able – whatever it might – however it might provide an inference of something. The other reason it's not enough to provide an inference of fraud is because they don't connect it with anybody, except, you know, Mr. Svetkoff certainly knows what he wished he had pleaded. He wished he had pleaded that Witness 49 had actually seen something about revenue being recognized, but he pleads only the conclusion. He wished – wishes that Witness 49 had been told that revenue was recognized, but he doesn't say that. He wishes that Witness 49 had been – had been present at some point where supposedly Ms. Minton or Mr. Williams or Mr. Quinn or somebody pressured Mr. Myers, but he doesn't. He just states the water cooler gossip and says that that's good enough. That's what Silicon Graphics means is now we just plead water cooler gossip. That isn't enough, Your Honor. If I might, one last point on this. Mr. Svetkoff claims that the plaintiffs didn't have access to this Quinn e-mail until after the dismissal argument. Well, for one thing, there wasn't an argument in this – on this cycle. But more importantly, they had that e-mail when they amended their complaint the last time. I find it just remarkable that they're coming in now having received the e-mail. As you can see on the docket sheet, as they acknowledge that they got the e-mail on ER 209, you see the declaration of Mr. Quinn submitted November 14th. The revised second amended complaint was filed December 9th. There's a reason they didn't submit that e-mail then. The reason is that quite clearly what Mr. Quinn is talking about is something that was carried on over a period of time. It wasn't a big one-off debit memo run that somehow cleaned out an entire balance of unaccomplished clash. It was some practice about which we know nothing that occurred over a period of time. They realized when they filed their second – revised second amended complaint that it didn't help them. It just added more confusion, and that has not changed. With respect to the predictions, which is really the crux of this case. One question is – and I intended to ask Mr. Shvetkov this. The question is whether these statements are predictions or whether they're descriptions of what is actually going on. I would assume that Mr. Shvetkov, although at times he talked about that they should have known enough not to make these predictions, at other times he was saying they were misreporting the events that were actually occurring at the time. So if you want to discuss them both, but would you not agree that at least their complaint is that there were both erroneous predictions and false reports about whether or not the economy and the glitches in the product were both actually having an adverse impact at the time Mr. Ellison and others were reporting that they were not having such an impact? They do plead statements that talk about the current condition – about current conditions. The entire crux of the complaint, however, the only thing that they ever say affected anybody was the fact that they claim that – and the fact is true that Oracle didn't make its numbers at the end of the quarter. That's where the stock drop happened. And they claim Oracle should have known it earlier. And, yes, some of these I'm not disagreeing with, Your Honor. There are statements that are statements of current conditions. But whether they're current conditions or future conditions, they never plead anything about what about the current conditions made anything that Oracle was saying untrue. Were sales up at a particular time? Were they down? What did the pipelines look like? We never hear from them. We hear from a few witnesses scattered – a few dozen witnesses, a much smaller amount actually talking about the third quarter that say that I didn't have anything. Nobody I knew had anything. There was a disastrous falloff. Zero in the pipeline. The pipeline collapsed. Zero sales. No big deals. Nothing going on. People at 20 percent of the quota. And this is first quarter, second quarter, third quarter. The one thing we do know is that those people were not representative of what the company was doing as a whole. Where they fit, what the context is, we never know. But we know that earnings went up in the first quarter. They went up in the second quarter. And they went up in the third quarter where Oracle had a record-breaking quarter but just didn't break it as much as they thought they would. So whatever these people were experiencing, yes, of course there were people having tough times. But was the company as a whole doing as well as expected at the particular time the particular statements were made? We never hear. There's not a single fact pleaded that would lead to an inference that the general statements about pipelines and expectations were false. Again, they have people who could have said, well, no, the company was really using different figures, a typical prediction case. They didn't really think that. There's nothing like that. So they chose to plead this claim based on statements of overall conditions, overall expectations, company-wide, with applications, licensing, company-wide. And they never give us a single statement as of a single time. They never talk about the assumptions that are being made. They don't talk about anything. They just say these guys were having a tough time. Therefore, you can infer that what Oracle saw overall, even though it was completely different at the end as it was at the beginning from what these people say was happening, you can infer from the fact that some people were having a tough time that Oracle was lying about what was going on. And you can't infer that. That's not what the pleading standard means. This is pure speculation dressed up in lots of detail about the company. It's not detail that goes to the statements that they claim were false. Have you thought about asking our mediation system of this Court to step in and present your case to them? We have not. We have a very, very, very competent mediation system. I'm not even going to turn around and see the expression on my client's face, Your Honor, but we have not discussed it and we appreciate the suggestion. The answer is no? The answer is it has not been discussed, Your Honors. It has not been discussed because, based on this pleading, we don't find that there is anything to discuss. We find, again, there's lots of details, but when you get to the point, when you get to the point, was revenue recognized, it falls apart on scrutiny. There just isn't anything there. There's lots of numbers that don't add up. If they have a theory about fraud, and this is intentional fraud they're talking about, they've got to have some kind of explanation, and they don't have it. It's interesting to see how this all came about. They knew they couldn't plead that the predictions were false. The evidence isn't there. They don't have it. They're not going to find it. They can look until the sun comes up and down another thousand times. They're not going to find it. So they have to make it sound like, well, maybe things were worse before. And what do they do? Do they go to their vice president of finance who said that Oracle made its second quarter numbers? No. They go to people outside the company and then find a collections manager to say, plead conclusions without pleading any basis for knowledge. And that's turning particularized pleading into reporting of water cooler gossip. There's nothing there. And they claim that Oracle must have known all kinds of things because it has databases. Well, what does that mean? Again, they don't say what they must have known. They claim they plead contents of documents, but they don't plead contents. They say Oracle must have known that things were worse than they said they were. Why? Well, because at the end of the day, hindsight discloses that at the end of the day, they didn't do as well as they thought they would. They claim you can't possibly think that things went wrong in the last few days of the quarter. Oracle has been warning about that in its public securities filings for years because that's how the business works. They ask all kinds of inferences, and they need inferences to make up for the facts they fail to plead. They fail to plead a coherent theory of how revenue was recognized, and they fail to plead anything that undercuts the statements about how the company was doing at a particular time. I'll pause for a minute if there are any questions and wrap up a couple of loose ends. One thing I do want to address directly in my remaining time is the product allegations. The product allegations on 11i basically say that the defendants didn't disclose that there were bugs in this new complex software product. In fact, they make a big deal over Larry Ellison sometime later saying, you know, Mayacopa is a complex software product. It has bugs. They all do. What they don't say is the defendants never said it didn't have bugs. They say that there are people who said the product didn't work. They also plead, you know, and I believe it's 528 of the extractor record, big customers coming in and saying how well it did work. And what's most important and what's most interesting, again, looking at the totality of the pleading, as this Court must, is that in the very midst of saying 11i, it didn't work at all, and the worst part was CRM, the part that the warnings focused on, that there might be bugs. The worst part was CRM. And then they turn around on the other side of their mouth and they say, how do we know? What is our basis for scienter on all these allegations, both the debit memos and the predictions and the statement of current status of life? How do we know that? It's because the CRM is perfect. It allows Larry Ellison not only to know everything about the past, but he can predict the future with it. It's perfect. The other side of their mouth is saying it didn't work. The totality of the pleading just doesn't, again, it just doesn't add up. More important, they can't connect 11i to the problems that they claim that Oracle had, much less the problems at a particular time. They talk about a bunch of deals. They only tie three of them to 11i and the third quarter. And as we point out in our brief, two of them, they don't even say when those deals went bad. So they have one deal that went bad. They have one deal that went bad because Telia heard about the problems at Bell South, which suggests that the information was well within the market, as it was. And under Heliotrope, this court not only can but should take judicial notice of the documents that were submitted in the trial court that showed that by the end of October, this was on everybody's lips, that there were bugs in 11i. This was no surprise. The question was whether people were buying it. They don't take issue with the numbers pleaded on that, the reports of how many people were buying it at a particular time. More generally on the lost deals, again, they show that there are $200 million tops in lost deals. Now, most of these are reported by consultants, and indeed most of what they talk about in the things that happened during the quarter are about consultants, where consultancy just about made their numbers. They don't talk about license. And consultancy moreover, as recognized and as Oracle sets out in its filings, revenue isn't recognized when you cut the deal. It's when you perform the services. So it has much less effect on immediate revenue recognition. We went exhaustively over those in our briefs, and I'm not going to repeat it here. But once again, there's much less than they claim they pleaded has actually been pleaded. I'm at the end of my time, and thank you. Thank you very much, Mr. Falk. What about mediation? There are head-on points, Judge Ferguson. They're not interested in mediation, and we have to get to a level playing field where before we get there. Your answer is no? Not yet. Okay. Let's put this back in the procedural context of this case. This is a 12b-6 motion. So when Mr. Falk says there's an explanation or that this is the way things operate cyclically or that we have nothing to hide or that this is water cooler gossip, you know, that's wonderful for a jury argument, that they have countervailing facts and explanations for all of this. But this is still a 12b-6 motion. And what the PSLRA did was try to set up a mechanism for blocking sham suits with no evidence, not meritorious suits with a plausible factual basis. And when 49 witnesses, including three former vice presidents of this company, say that defects not just bugs, but defects in the communication between different pieces of equipment, it's misleading for Mr. Falk to say that we plead that Mr. Ellison can see everything on this sales database and also plead defects. The defects were integrating different pieces. It didn't say that you couldn't see the sales. And we're not you don't have to take our word for it. Mr. Sanderson, Mr. Henley, and Mr. Ellison said they saw the sales. And the witnesses say that the sales were going south. And the result of the quarter was that the sales went south. So how did Mr. Ellison see the sales go north? Well, they say, you don't provide a snapshot of any day in which the sales were going south. We can't. I mean, that's the classic internal stuff that we can't get at. And if that's what we have to plead, then you should throw us out. But look, it's not what we don't plead. It's what we do plead that you have to evaluate. And what we do plead is that we have witnesses who say this was going on over a period of time. They identify 20 lost sales for in December and January, the first two months of the quarter, of nearly $186 million. The customers come in and confirm the product isn't working. The witnesses inside Oracle say the product isn't working. Vice President CW45 says the product isn't working. Now, when Mr. Falk kind of says I'm lying, I get upset. Because he knows that we didn't have the Quinn e-mail in full. We have the second page. But the smoking gun is on page one. And he gave it to us during the pleadings. In fact, if you look at ER81, Mr. Quinn's declaration says that a complete copy of the e-mail is attached here, too, as Exhibit A. And they jumped on us during that motion to preserve the evidence for not providing the first page. And I'm delighted to go over it with you again. We need to provide what impact this process had on revenue in each of the last eight quarters. That tells you a lot about those documents that Judge Ferguson say speak for themselves. Credit revenue. We didn't plead content. No, they gave us the content and we pled it. Credit revenue. Credit revenue. In 46,811 documents, all on one day, November 17, 2000, two weeks before the end of the period. He said they had a good quarter in the second quarter only by cooking the books. Only by cooking the books. And remember, these are allegations. There's a trial to be had. There's discovery to be had. There's summary judgment. They may have their explanations, but this is not the place. And the trouble with this case is the district court accepted those explanations. And he had no business doing that. Under America West, the first case after 20 straight losses, this court said the error in the district court was in not crediting the allegations and allowing this nitpicking to go on. And that's what it is. They nitpick. That CW 49 who said he objected to Mr. Quinn didn't see it. Well, how do you object to your vice president of revenue accounting that you're improperly taking customer money if you didn't see it? Come on. The credit revenue documents support it. The investigation that was done by CW 46 supports it. They cooked the books to conceal the fact that the second quarter was going south just like the third quarter did. The three of us have been on the bench a long time. Pardon? The three of us have been on the bench a long time. And I'm going to let you take your break now, Judge. No, no, no, no. Do me, counsel. Just do me. Yes. Ready? I'm ready. Most of the time, all we listen to is nitpicking. What's wrong with judges nitpicking? Nitpicking on a trial record? Maybe. But nitpicking on a 12B6 motion where we get the inferences you said didn't work in America West. I read your opinion. Nitpicking makes new law. Not always. Not always. Not on a 12B6. Not on a 12B6. Oh, you know, there is one thing. Mr. Falk played the numbers game. There was only $130 million. How did it become $230 million? How did it become $690 million? The witness said there was $130 million in one quarter. We now know that they admit $692 million was converted. They say there was an indication that this occurred over eight quarters. So this cyclical business that he's talking about may be accounted for by the fact that they've been cooking the books a lot longer than we know. All we know is our witnesses tell us it happened in the second quarter. But to suggest that they have a cyclical explanation is, A, improper at this stage, and, B, maybe not even correct. So to inject that into this process to create a doubt is the sort of nitpicking, Judge Ferguson, that is inappropriate at this stage. Unless there are any questions, I'll sit down. Thank you, counsel. Thank you both very much. Case just argued will be submitted. The court will take a brief recess before the next case.
judges: Ferguson, Reinhardt, Paez